**RECORD NUMBER: 14-1098(L)**

# United States Court of Appeals
### *for the*
# Fourth Circuit

**ROBERT DONNERT & DAVID DONNERT,**

*Appellees/Cross-Appellants,*

– v. –

**FELD ENTERTAINMENT, INC.,**

*Appellant/Cross-Appellee.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT ALEXANDRIA**

# OPENING BRIEF OF APPELLANT/CROSS-APPELLEE

WILLIAM BOYLE PORTER
LAURIE PROCTOR
BLANKINGSHIP & KEITH, PC
4020 University Drive
Suite 300
Fairfax, Virginia 22030
(703) 293-7236

*Counsel for Appellant
Feld Entertainment, Inc.*

CP  COUNSEL PRESS • VA – (800) 275-0668

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __14-1098__        Caption: __Robert Donnert, et al. v. Feld Entertainment, Inc.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Feld Entertainment, Inc., d/b/a Ringling Bros. and Barnum & Bailey Circus__
(name of party/amicus)

_____

 who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?      ☐YES ☑NO

2.      Does party/amicus have any parent corporations?                ☐YES ☑NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                ☐YES ☑NO
        If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature:    William B. Porter
Digitally signed by William B. Porter
DN: cn=William B. Porter, o=Blankingship &
Keith, P.C., ou, email=wporter@bklawva.com,
c=US
Date: 2014.02.18 15:48:03 -05'00'    Date:    February 18, 2014

Counsel for:    Appellant Feld Entertainment, Inc.

## CERTIFICATE OF SERVICE
**************************

I certify that on    February 18, 2014    the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Craig D. Roswell, Esquire
Jason M. Setty, Esquire
NILES, BARTON & WILMER, LLP
111 S. Calvert Street, Suite 1400
Baltimore, Maryland 21202
Phone: (410) 783-6300
cdroswell@nilesbarton.com

R. Wayne Pierce, Esquire
THE PIERCE LAW FIRM, LLC
133 Defense Highway, Suite 106
Annapolis, Maryland 21401-7015
Phone: (410) 573-9955
Fax: (410) 573-9956
wpierce@adventurelaw.com

William B. Porter
Digitally signed by William B. Porter
DN: cn=William B. Porter, o=Blankingship &
Keith, P.C., ou,
email=wporter@bklawva.com, c=US
Date: 2014.02.18 15:48:45 -05'00'

(signature)    February 18, 2014

(date)

- 2 -

# TABLE OF CONTENTS

Corporate Disclosure Statement

Table of Authorities ................................................................................ iv

Jurisdictional Statement ........................................................................ 1

Statement of the Issues........................................................................... 1

Statement of the Case............................................................................. 2

I.      Statement of the Case ........................................................... 2

II.     Statement of Facts................................................................. 4

        Reassignment from Gold Unit to Red Unit ......................... 6

        Winter Quarters for the Red Unit ........................................ 8

        After Winter Quarters, the Donnerts Refused to Perform................. 13

        The Donnerts' Termination ................................................. 15

Summary of the Argument...................................................................... 16

Argument.................................................................................................. 19

I.      The District Court Erred in Submitting the Case to the Jury when
        the Donnerts' Breach of the Agreements Justified their Discharge ... 19

        A.     Standard of Review .................................................... 19

        B.     Under the Agreements, Feld Had Cause to Terminate the
               Donnerts' Employment. ............................................. 19

               1.  The Agreements Unambiguously Required the Donnerts
                   to Perform as Directed by Feld ........................... 20

2. The Donnerts Breached the Agreements by Refusing to Perform as Directed............................................................. 21

C. The District Court Erred in Denying Summary Judgment when the Undisputed Facts Demonstrated an Actual Breach by the Donnerts that Justified their Discharge ......................... 24

D. The District Court Similarly Erred in Denying Feld's Rule 50 Motion when the Evidence at Trial Further Proved that the Donnerts Breached the Agreements, Justifying their Discharge ................................................................................. 26

II. The District Court Erred by Denying Feld's Rule 50 Motion and by Instructing the Jury that Feld Had an Implied Duty of Good Faith and Fair Dealing in Any Provision of the Agreements ............. 27

A. Standard of Review ................................................................. 27

B. Any Implied Duty of Good Faith and Fair Dealing is Inapplicable to this Case. ....................................................... 27

1. By Trial, No Claim for Breach of an Implied Duty of Good Faith and Fair Dealing Remained an Issue in the Case ...................................................................................... 27

2. The Supreme Court of Virginia Has Not Recognized this Implied Covenant in Employment Contracts....................... 29

3. Even if this Duty Exists, It Cannot Prevent a Party from Exercising Contract Rights or Allow It to Rewrite Contract Terms ................................................................... 31

4. Plaintiffs Presented No Evidence that Feld Breached Any Implied Covenant of Good Faith and Fair Dealing .... 35

C. Section 7(c) of the Lease Did Not Impose a Duty on Feld to Change its Show Order to Accommodate the Donnerts. ......... 38

1. The Court Erred in Adopting the Donnerts'
    Interpretation of Section 7(c) ............................................... 38

2. The Evidence at Trial Demonstrated that Feld Did
    "Work With" the Donnerts as to Any Safety Concerns...... 42

III.    The District Court Erred in Instructing the Jury that a Party to a
        Contract who Prevents the Other from Performing has Breached
        the Contract ......................................................................... 43

IV.     The District Court Erred in Denying Feld's Rule 50 Motion when
        the Donnerts Failed to Present Evidence of Their Damages.............. 46

V.      The District Court Erred in Denying Feld's Motion for a New
        Trial Based on the Donnerts' Inappropriate Remarks during Trial ... 48

    A.    Standard of Review .................................................. 48

    B.    The Donnerts' Remarks During Trial regarding Excluded
          Evidence Misled the Jury. ........................................ 48

Conclusion ...................................................................... 50

Request for Oral Argument.......................................................... 50

Certificate of Compliance

Certificate of Service

# TABLE OF AUTHORITIES

**Cases:**

Al-Abood v. El-Shamari,
        217 F.3d 225 (4th Cir. 2000) ........................................................ 27, 43

Baradell v. Bd. of Social Servs.,
        970 F. Supp. 489 (W. D. Va. 1997) .................................................. 30

Baxter Research Med., Inc. v. Medtronic, Inc.,
        No. 98-1608,  1999 U.S. App. LEXIS 2850
        (4th Cir. Feb. 24, 1999) ................................................................ 39, 41

Bryant v. Aiken Reg'l Med. Ctrs., Inc.,
        333 F.3d 536 (4th Cir. 2003) ............................................................ 48

Burgin v. Office of Personnel Mgmt.,
        120 F.3d 494 (4th Cir. 1997) ............................................................ 39

Chao v. Rivendell Woods, Inc.,
        415 F.3d 342 (4th Cir. 2005) ............................................................ 28

Charles E. Brauer Co. v. NationsBank of Va. N.A.,
        466 S.E.2d 382 (1996) ...................................................................... 32

Charlie Norfolk Ctr. Assocs., L.P. v. Norfolk Redev. & Hous. Auth.,
        No. 2:06-cv-00616, 2007 U.S. Dist. LEXIS 97180
        (E.D. Va. May 18, 2007) .................................................................. 44

Crescent Horseshoe Co. v. Eynon,
        27 S.E. 935 (Va. 1897) .............................................................. 25, 26

Devnew v. Brown & Brown, Inc.,
        396 F. Supp. 2d 655 (E.D. Va. 2005) .......................................... 30, 31

Emergency One, Inc. v. Am. FireEagle, Ltd.,
        228 F.3d 531 (4th Cir. 2000) ............................................................ 27

Enomoto v. Space Adventures, Ltd.,
    624 F. Supp. 2d 443 (E.D. Va. 2009) ................................................... 32

Florida Auto Auction v. U.S.,
    74 F.3d 498 (4th Cir. 1996) ............................................................... 19

Fransmart, LLC v. Freshii Dev., LLP,
    768 F. Supp. 2d 851 (E.D. Va. 2011) ........................................... 39, 41

Hale v. Fawcett,
    202 S.E.2d 923 (Va. 1974) ................................................................ 46

Harrison v. U.S. Bank Nat'l Ass'n,
    No. 3:12-cv-00224, 2012 U.S. Dist. LEXIS 85735
    (E.D. Va. June 20, 2012) ............................................................ 29, 30

Healy v. Chesapeake Appalachia, LLC,
    No. 1:10-cv-00023, 2011 U.S. Dist. LEXIS 759
    (W.D. Va. Jan. 5, 2011) ..................................................................... 30

Heyman v. Kline,
    344 F. Supp. 1088 (D. Conn. 1970) ................................................... 25

Hill v. Crum,
    727 F.3d 312 (4th Cir. 2013) ................................................. 19, 27, 46

In re Buffalo Coal Co.,
    No. 06-336, 2010 Bankr. LEXIS 473
    (Bankr. N.D. W. Va. Feb. 26, 2010) ..................................... 32, 34, 36

In re Nagel,
    278 F. 105 (2d. Cir. 1921) ................................................................. 24

L&E Corp. v. Days Inn of Am., Inc.,
    992 F.2d 55 (4th Cir. 1993) ............................................................... 29

Land & Marine Remediation, Inc. v. BASF Corp.,
    No. 06-336, 2012 U.S. Dist. LEXIS 88601
    (E.D. Va. June 26, 2012) ........................................................... 33, 35

LBCMT 2007-C3 Sterling Retail, LLC v. Sheppard,
　　No. 1:12-cv-00470, 2013 U.S. Dist. LEXIS 69913
　　(E.D. Va. May 15, 2013) ..................................................................... 32

Leahey v. Fed. Ex. Corp.,
　　685 F. Supp. 127 (E.D. Va. 1988) ......................................... 24, 25, 26

Light v. Beaver Creek Dev. Partners,
　　No. 97-1043, 1997 U.S. App. LEXIS 26910
　　(4th Cir. Sept. 30, 1997) ..................................................................... 44

Mickens v. Lockheed Martin Corp. Mission Sys. & Sys.,
　　No. 1:11-cv-0117, 2012 U.S. Dist. LEXIS 93209
　　 (E.D. Va. July 5, 2012) ....................................................................... 30

Nehi Bottling Co. v. All-American Bottling Corp.,
　　8 F.3d 157 (4th Cir. 1993) ........................................................... 20, 45

Parkridge Phase Two Assocs. v. Lockheed Martin Corp.,
　　172 F.3d 44, 1999 U.S. App. LEXIS 1422 (4th Cir. Feb. 2, 1999) ... 46

Pilar Servs. v. NCI Info. Sys.,
　　569 F. Supp. 2d 563 (E.D. Va. 2008) .................................................. 46

Seabulk Offshore, Ltd. v. Am. Home Assur. Co.,
　　377 F.3d 408 (4th Cir. 2004) .............................................................. 39

Sellers v. Sch. Bd. of Cty. of Manassas,
　　960 F. Supp. 1006 (E.D. Va. 1997) ..................................................... 31

Skillstorm, Inc. v. Elec. Data Sys., LLC,
　　666 F. Supp. 2d 610 (E.D. Va. 2009) ............................................ 32, 36

Sloas v. CSX Transp., Inc.,
　　616 F.3d 380 (4th Cir. 2010) ........................................................ 19, 27

Spotsylvania Co. Sch. Bd. v. Seaboard Surety Co.,
　　415 S.E.2d 120 (Va. 1992) .................................................................. 44

Stoney Glen, LLC v. So. Bank & Trust Co.,
    No. 2:13-cv-00008, 2013 U.S. Dist. LEXIS 63763
    (E.D. Va. May 2, 2013) ...................................................... 31, 32, 35, 36

Sun Hotel, Inc. v. SummitBridge Credit Investments III, LLC,
    No. CL-2012-14062,  2013 Va. Cir. LEXIS 4
    (Va. Cir. Ct. (Fairfax Co.) Jan. 23, 2013)........................................... 33

Swierkiewicz v. Sorema N.A.,
    534 U.S. 506 (2002)........................................................................ 28

Vazzana v. Citimortage, Inc.,
    No. 7:12-cv-00497,  2013 U.S. Dist. LEXIS 78541
    (W.D. Va. June 4, 2013) ................................................................... 32

Ward's Equipment, Inc. v. New Holland N. Am.,
    493 S.E.2d 516 (Va. 1997) ............................................................... 32

Whitt v. Godwin,
    139 S.E.2d 841 (Va. 1965) ............................................................... 44

Winn v. Aleda Constr. Co.,
    315 S.E.2d 193 (Va. 1984) ............................................................... 20

Wolf v. Fannie Mae,
    512 Fed. Appx. 336 (4th Cir. Feb. 28, 2013) .............................. 31, 33

**Rules, Statutes, and Other Authorities:**

28 U.S.C. § 1291 ................................................................................. 1

28 U.S.C. § 1332 ................................................................................. 1

Fed R. Civ. P. 26(a)(2) ...................................................................... 49

Fed R. Civ. P. 59 ............................................................................... 47

Fed. R. Evid. 401 through 403 .......................................................... 49

Fed. R. Evid. 802 .............................................................................. 49

Fed. R. Evid. 901 ........................................................................... 49

Restatement (Second) of Contracts § 203(c) ................................. 39

Va. Code § 8.1A-304 ..................................................................... 31

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction of this action pursuant to 28 U.S.C. § 1332 based on diversity of citizenship and an amount in controversy exceeding $75,000. The District Court entered a final judgment in favor of Plaintiffs Robert Donnert and David Donnert ("the Donnerts") on January 7, 2014. Appellant Feld Entertainment, Inc., d/b/a Ringling Bros. and Barnum & Bailey Circus ("Feld"), timely filed its Notice of Appeal on February 3, 2014. Accordingly, the Court of Appeals has jurisdiction of this appeal pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Did the District Court err by denying in part Feld's Motion for Summary Judgment and denying Feld's Motion for Judgment as a Matter of Law with respect to Counts I (Breach of Employment Contract) and Count II (Breach of Lease) when the undisputed evidence demonstrated that the Donnerts breached the requirement in an entertainment employment contract that they perform as directed by Feld, thereby providing Feld with cause to terminate the employment contract and related lease of act?

2. Did the District Court err in improperly instructing the jury that Feld had a duty of good faith and fair dealing when Virginia law and the evidence did not support the instruction and the District Court already had dismissed the claim?

1

3.      Did the District Court err in instructing the jury that "a party to a contract who prevents the other party from performing his obligations has breached that contract" when Feld's actions, which the Donnerts claimed prevented their performance, were permitted by the parties' contracts?

4.      Did the District Court err in denying Feld's Motion for Judgment as a Matter of Law when the Donnerts had failed to present evidence of damages?

5.      Did the District Court err in denying Feld's Motion for a New Trial when the Donnerts and their counsel had made repeated, prejudicial remarks during trial regarding excluded evidence?

## STATEMENT OF THE CASE

## I.      Statement of the Case.

Brothers David Donnert and Robert Donnert[1] are horse trainers and circus performers hired by Feld to perform two discrete, self-contained acts—a juggling on horseback routine ("Juggling Act") and a comedy horse routine ("Comedy Act") (collectively, "the Acts")—as part of a much larger show on one of Feld's traveling circus units.  In early January 2011, just after the new circus unit to which the Donnerts had been assigned had completed rehearsals and was preparing to embark on a two year tour schedule, the Donnerts informed Feld that they would not perform the Comedy Act in the slot in the show assigned to them by Feld

---

[1]  Due to the common surname and to avoid confusion, David and Robert Donnert are referred to individually by their first names.  No disrespect is intended.

because the Donnerts did not believe that their act could successfully follow the conclusion of an unrelated tiger act that was performed in another area of the stage floor just prior to their act.  On January 9, 2011, after attempting without success to accommodate the Donnerts' concerns and after being told by the Donnerts that they would not perform their Comedy Act unless Feld changed the order of the show, Feld terminated the Donnerts' employment, thereby also terminating a lease of the Donnerts' horses and acts.

On January 9, 2013, the Donnerts filed a complaint in the District Court, alleging that Feld had wrongfully terminated their Employment Contract and Lease (collectively, "the Agreements"), breached the parties' Agreements as to their pay, and violated the Occupational Safety and Health Act ("OSHA") as well as an equivalent statute under Florida state law.  Following the District Court's June 14, 2013, order granting in part Feld's Motion to Dismiss and its October 15, 2013, order granting in part Feld's Motion for Summary Judgment, the sole issue for trial was whether Feld had cause to terminate the Donnerts' Agreements.

A jury trial began on November 12, 2013.  At the close of the Donnerts' case, Feld moved the District Court for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure, which motion the District Court took under advisement.  On November 15, 2013, the jury returned a verdict in favor of the Donnerts, awarding $30,800 to each of the Donnerts for breach of the

Employment Contract and $26,400 to each of the Donnerts for breach of the Lease. Following the verdict, the District Court ordered the parties to file briefs relating to Feld's pending Rule 50 Motion by the following Wednesday, November 20, 2013.

On November 20, 2013, Feld filed its brief, renewing its Motion for Judgment as a Matter of Law pursuant to Rule 50 and, in the alternative, moving the District Court for a new trial pursuant to Rules 50 and 59 of the Federal Rules of Civil Procedure. On January 3, 2014, the District Court entered an order denying both motions. On January 7, 2014, the clerk entered judgment in this matter in accordance with the verdict of the jury. On February 3, 2014, Feld timely filed its Notice of Appeal.

## II.     **Statement of the Facts.**

Feld is a family-owned and operated company that has produced the Ringling Bros. and Barnum & Bailey Circus since 1969. (J.A. 474-75.) Feld operates three traveling circus units in the United States: the Red Unit, the Blue Unit, and the Gold Unit. (J.A. 476.) The Red and Blue Units are Feld's largest shows, and they travel by train on a 90 city, two-year tour of the largest markets in the United States. (Id.) By contrast, the Gold Unit is a smaller, one-ring experience (instead of a three-ring show) designed for smaller venues that travels the country by truck and trailer to secondary and tertiary markets. (Id.)

In early 2010, Feld was in need of a mid-tour replacement act on its Gold Unit. (Id.) While searching for a replacement act, Feld learned that the Donnerts performed juggling and comedy acts involving horses for other smaller circuses. (J.A. 476-77.) Feld contacted the Donnerts, learned that they were interested and available to join Feld, and made arrangements for Nicole Feld ("Ms. Feld"), Feld's Executive Vice President, to travel to Massachusetts to scout the Donnerts' Acts in a previously scheduled performance. (Id.)

After Ms. Feld viewed the Acts, she met with the Donnerts to discuss terms of employment and to negotiate the Agreements. (J.A. 367, 479-80.) At the end of the meeting, the parties entered into an agreement ("Employment Contract"), pursuant to which the Donnerts agreed to perform the Juggling Act and the Comedy Act on Feld's Gold Unit, with an option for Feld, in its sole discretion, to move the Acts at any time to the Blue or Red Units. (J.A. 479-80; J.A. 620 at §§ 1, 4(a)-(b).) The parties also entered into a lease ("Lease"), pursuant to which the Donnerts agreed to provide Feld with "healthy, well-trained horses" and any and all equipment necessary to perform the Acts. (J.A. 480, 635-648.) Like the Employment Contract, the Lease also allowed Feld to transfer the Donnerts to any of Feld's other touring circus units. (J.A. 635.) Neither the Employment Contract nor the Lease contained any limitations as to the Donnerts or their horses' ability to perform on a circus unit.

5

Both the Employment Contract and the Lease further reserved for Feld the right to supervise, direct, and control the Acts and to use the Acts "in such manner as Feld determines in the Show . . . in accordance with Feld's specifications and high standards." (J.A. 620 at § 1; J.A. 636 at § 2(a).) Ms. Feld went over the provisions of both Agreements with the Donnerts before they signed them (J.A. 480), and the Donnerts have agreed that they "represented that they would be ready to present the Acts in a manner as determined by Feld." (J.A. 438-39.)

Shortly after signing the Agreements, the Donnerts joined Feld's Gold Unit. (J.A. 364-65.) At that time, both Robert and David performed the Juggling Act with two of their horses, Karolyi and Suarez (J.A. 331-332), and David performed the Comedy Act alone with a single horse, Cornbread. (J.A. 381.) The Comedy Act, in its pre-Feld original form, was a "drunken horse" routine; so, the Donnerts agreed to modify the act for Feld when they joined the Gold Unit to make it more family-friendly. (J.A. 333, 382-83, 386.) The Donnerts' fourth horse, Bear Claw, was to serve as a "back-up" horse for the Comedy Act (J.A. 381, 537); though, unbeknownst to Feld, Bear Claw had never before performed before a live audience. (J.A. 420.)

### Reassignment from Gold Unit to Red Unit

In the summer of 2010, Feld exercised its option to transfer the Donnerts from the Gold Unit to the Red Unit, which transfer was to be effective at the end of

6

November 2010, when the Red Unit entered "Winter Quarters" to rehearse and train for its next two-year production run. (J.A. 330, 365; J.A. 620 § 1(b).) At that time, Feld's creative team had been developing the Red Unit's next two-year production and planned to incorporate both of the Donnerts' Acts into the running storyline throughout the show. (J.A. 487, 489.)

Despite the Donnerts' prior contractual commitment to move to the Red or Blue Units at Feld's sole discretion (J.A. 620 § 4(b); J.A. 635 § 1; J.A. 367-68), the Donnerts did not want to leave the Gold Unit. (J.A. 327-28, 371-72.) When Vinicio Murillo, one of Feld's two Directors of Talent, met with the Donnerts during the Gold Unit's stop at Coney Island in July 2010 to discuss their move to the Red Unit, the Donnerts told Mr. Murillo that they refused to move. (J.A. 452-53, 523.) Instead, the Donnerts told Feld that they would rather leave Feld altogether than go to the Red Unit. (J.A. 372.) And when Feld insisted that they move to the Red Unit as they had agreed to do, the Donnerts demanded that Feld renegotiate the Agreements, demanding more salary (above the $400/week increase previously negotiated in the Employment Contract), additional maintenance costs, grooms (hired by Feld) to help them with their animals, and that Feld hire Robert's wife, Tiffany, for an additional salary to help with the Acts. (J.A. 376, 527-28, 531.)

Ultimately, in October 2010, Feld agreed to the Donnerts' demands because Winter Quarters for the Red Unit was scheduled to begin the following month and because Feld wanted the Donnerts to be happy on the Red Unit; therefore, the parties executed an addendum to the Agreements ("First Addendum"). (J.A. 532; J.A. 649-51.) The First Addendum, among other things, added Robert's wife to the Employment Contract at an additional cost to Feld, expanded the Acts for the Red Unit, and increased the amount of rent the Donnerts would receive under the Lease to $600/week. (J.A. 649-51.) The First Addendum further provided that the Donnerts would be subject to disciplinary action, including termination, if they failed to perform in a first class, professional manner or disrupted or impeded Feld's creative and production value and direction of the Production in any way. (J.A. 650 at § 8.)

## Winter Quarters for the Red Unit

In late November 2010, the Donnerts arrived at Winter Quarters to begin rehearsing their Acts with the other Red Unit performers. (J.A. 330, 492-93.) When Winter Quarters began, the Donnerts' involvement in the two-act show was as follows. The Donnerts' Juggling Act was the first act following the opening of Act 1. (J.A. 335.) Later in Act 1, David and Cornbread made the first of three "passes" through the show, during which David entered the performance floor as a "wandering cowboy" with Cornbread, interrupting the show for a brief comedic

interlude. (J.A. 387-88.) David and Cornbread made their second comedic pass ("Second Pass") in Act 2, immediately following the tiger act ("Tiger Act") and before the first aerial act. (J.A. 388, 503, 554.) Then, after the second of two back-to-back aerial acts, David and Cornbread completed their third and final comedic pass ("Third Pass"), which led directly into the presentation of the full Comedy Act. (J.A. 388-89.)

Throughout the Winter Quarters rehearsal process, the substance of the passes and of the Comedy Act changed, and the Donnerts differed creatively with Feld's directors about these changes. (J.A. 389, 393.) For example, Feld asked the Donnerts on several occasions to shorten the length of the Comedy Act because the entire show, specifically Act 2, was running too long for children's attention spans. (J.A. 386, 484, 496.) But David did not like the fact that time was cut from his Act, and he believed that vital elements of the Comedy Act had been removed. (J.A. 386.) On December 18, 2010, David's frustration over what he considered to be a lack of creative vision for the show led to a shouting match with the show's Director, which was captured on video. (J.A. 389-93; 656 (Def. Video and Audio Exs. 81-82).) During this altercation, David told the show's Director, "I don't even want to be here anymore. . ." and "I'll tell you right now, I will not do this, I will not ruin my act. . . ." (J.A. 390-91, 656 (Def. Video and Audio Exs. 81-82).)

9

After this altercation, the show order for Act 2 was modified because of the length of the Act and because the flow of the performance was not working well. Specifically, Feld's stage manager, who also had a role as a performer in one of the aerial acts, was finding it difficult to oversee the strike of the tiger cage at the end of the Tiger Act in his role as stage manager, and then change into his costume and perform immediately thereafter in an aerial act.  (J.A. 497.)  Thus, on the evening of December 18, 2010, the creative team changed the order of Act 2 of the show so that the Comedy Act would take place immediately after the previously scheduled Second Pass, which at all times had occurred immediately after the Tiger Act, thereby affording the aerial act more time to set up.  (J.A. 503-05.)  This change also allowed Feld to eliminate the Third Pass from the show, reducing the overall run time for Act 2.  (J.A. 504, 554-55.)  As a result of these changes, the new order of this portion of Act 2 was as follows: Tiger Act, Second Pass, Comedy Act, and then the aerial display and strap act.  (J.A. 504.)  Whereas, before the change, the order of this portion of Act 2 had been: Tiger Act, Second Pass, aerial display and strap act, Third Pass, and Comedy Act. (J.A. 335, 388.)

When the Donnerts learned that the show order had been changed to eliminate the Third Pass and to combine their Second Pass with the Comedy Act, they immediately announced that they would not perform the Comedy Act in its new slot in the show; this pronouncement was made before even trying their act in

the new show order.  (J.A. 395.)  Specifically, David bristled at the idea that his Comedy Act would be used as a diversion in an outer ring while Feld dismantled the tiger cage in the center ring, and he informed Mr. Murillo that he did not want Feld to treat his comedy horse act like a "comedy clown act."  (J.A. 398.)

Thereafter, the Donnerts first expressed the concern that the noise from the strike of the tiger cage would frighten Cornbread.  (J.A. 533.)  In response, Feld retrained the stage crew to modify the manner in which they disassembled the tiger cage, which greatly reduced the noise.  (J.A. 457, 517, 533-34, 556.)   And, the Donnerts conceded that acclimating animals to the loud noises that occur on a circus unit was part of their job.  In fact, the Donnerts had previously had success acclimating Cornbread to the sound of loud noises while on the Gold Unit when Cornbread performed after a loud motorcycle act.  (J.A. 401-02.)

Next, notwithstanding the fact that Cornbread's Second Pass had always followed the Tiger Act, the Donnerts expressed for the first time the concern that the scent from the tigers scared Cornbread.  (J.A. 456-60.)  But, Robert was able to use Vicks VapoRub and a carpet spray to mask the scent, which resolved the issue. (J.A. 446, 460.)  Indeed, by early January, the Donnerts were no longer raising with Feld the scent of the tigers as a concern.  (J.A. 459.)  Nor at any time during Winter Quarters did the Donnerts ever express the view or the opinion that the

11

sound from the breakdown of the tiger cage or the scent of tigers created a safety concern of any kind.  (J.A. 557.)

To the contrary, the Donnerts concede that horses and tigers have performed together at the same time and in the same ring.  (J.A. 446.)  Indeed, their cousin, Karoly Donnert, even trained tigers to ride on the backs of horses, which act he previously had performed for Feld.  (J.A. 351-52.)  And, in this case, the Comedy Act was performed in a different ring and at a different time than the Tiger Act (J.A. 504), and the tigers were leaving the arena floor in transport cages as David rode Cornbread into the arena, which had always been the set up for the Second Pass even before the show order had been changed.  (J.A. 349, 405, 504-05.)  Both before and after the show order changed, the Donnerts never experienced problems performing the Second Pass immediately after the Tiger Act. (J.A. 504-05, 554.)

Subsequently, however, Cornbread began to have problems performing the very last trick in the five or six-minute Comedy Act, which required him to lie down, and, occasionally, Cornbread would stand up prematurely during that final part of the Comedy Act, which occurred long after the tigers had left the arena and the cage had been disassembled.  (J.A. 353, 457, 505 555; 656 (Pl. Video Ex. 7I).)[2]

_____

[2] Plaintiff's Trial Exhibit 7I (J.A. 656), which is on a compact disk attached to the Appendix, reflects the running time of the Comedy Act in relation to the Tiger Act and the Second Pass, which begins after the Tiger Act and leads into the Comedy Act.  This video is from a practice session at Winter Quarters shortly after the show order had changed.

Although the Donnerts were given extra time to work with Cornbread each day on the performance floor to acclimate him to the new show order, the Donnerts did not take advantage of the training time.  (J.A. 398.)  Instead, during Winter Quarters, the only suggestion the Donnerts made to address the issues with the Comedy Act was to demand that Feld change the order of its show.  (J.A. 556-57.)

On December 28, 2010, during a "friends and family" rehearsal just before the show was to have its first public performance, Cornbread struggled to lie down at the end of the Comedy Act.  (J.A. 414-15.)  After the performance, a veterinarian was called to check Cornbread's back, and he referred Cornbread to SurgiCare, a local equestrian veterinarian clinic, where Cornbread was treated for muscle soreness.  (J.A. 356; 547.)  Because Cornbread was unable to perform, Feld asked the Donnerts to perform the Comedy Act with their back-up horse, Bear Claw.  (J.A. 418.)  Bear Claw, however, had not rehearsed at all during Winter Quarters (id.), and it was readily apparent to all that Bear Claw was not prepared to perform in a public setting.  (J.A. 537, 546, 558.)

### After Winter Quarters, the Donnerts Refused to Perform

On January 3, 2011, the Red Unit moved from Winter Quarters to Tampa, where it was scheduled to open their first public performances later that week, beginning January 5, 2011.  (J.A. 538, 557-58.)  That same day, David Kiser ("Mr. Kiser"), Feld's other Director of Talent, visited the Donnerts to discuss the

13

Comedy Act and to see if they could work together to solve the issues it was having.  (J.A. 462, 558.)  During this meeting, the Donnerts told Mr. Kiser that they were willing to work with Bear Claw to acclimate him to the show and to prepare him to present the Comedy Act.  (Id.)   Later that day, however, the Donnerts changed their position 180-degrees and sent an e-mail to Ms. Feld, informing her, for the first time, that they did not believe it was safe for them to perform the Comedy Act in its new slot in the show.  (J.A. 654.)  Ms. Feld forwarded the e-mail to Mr. Murillo and to Mr. Kiser, who were surprised by the fact that the Donnerts had changed their position from the meeting held earlier that day.  (J.A. 559.)  Accordingly, Mr. Murillo and Mr. Kiser scheduled another meeting with the Donnerts for the following day, January 4, 2011, to discuss how the Comedy Act could move forward in the show.  (J.A. 560.)

At the January 4, 2011, meeting, Feld offered the Donnerts three options in an effort to work with their Comedy Act:  (1) present the Juggling Act while continuing to practice, but not present, the Comedy Act until the horse was acclimated, in which case Feld would continue to pay the Donnerts for both acts; (2) remain with the Red Unit, present only the Juggling Act, and receive pay for only one act, or (3) separate from their employment with Feld if they chose, in which case Feld would permit the Donnerts to spend time seeking new employment while presenting only the Juggling Act.  (J.A. 350-60, 422, 467-68,

539-40.)  The Donnerts rejected all three of Feld's options and demanded instead that either the show's order be changed or that Feld transfer them back to the Gold Unit.  (J.A. 464, 466-67, 561.)  Leaving that meeting, Feld had no expectation that the Donnerts would perform the Comedy Act on the Red Unit.  (J.A. 561.)  Indeed, according to David Donnert, he did not think his horse would ever be able to perform the Comedy Act in its assigned slot in the show.  (J.A. 424.)

### The Donnerts' Termination

After the Donnerts had rejected all of the options presented by Feld at the January 4 meeting, Feld felt that the parties were at an impasse and decided to terminate the Donnerts for failing to perform as directed.  (J.A. 511 , 514, 561.) Specifically, Feld believed that it had provided the Donnerts with three viable options and that the Donnerts' rejection of all three options left Feld with no choice but to terminate the Agreements.    (J.A. 511, 561, 567.)    Accordingly, Feld requested that its legal department prepare a termination letter.  (J.A. 542,567-68.) Believing that the Donnerts were still under a probationary period at that time, which would have permitted Feld to terminate the Donnerts with or without cause, the termination letter was prepared to indicate that the Donnerts were being released from their Employment Contract pursuant to that probationary provision. (J.A. 568, 655.)  Had Feld realized that the probationary period was not in effect, Feld still would have terminated the Donnerts.  (J.A. 569-70.)

15

On January 9, 2011, Mr. Kiser signed the termination letter and presented it to the Donnerts. (J.A. 562.) At the time, Feld believed that it had cause to terminate the Donnerts on the ground that they were not able to perform, nor did they want to perform, the Acts as directed by Feld. (J.A. 561-62, 567.)

## SUMMARY OF ARGUMENT

This case presents for determination the question of whether employees-performers who contract to perform a discrete entertainment act in a multi-act, large-scale animal and musical production can refuse to perform their act in the place in the show assigned to them by the employer-producer and can recover for breach of contract when the employee-performers are discharged for admittedly refusing to present their act as directed. Put another way: can a producer-employer who has the express contractual right to dictate the manner in which it presents its performers in a live production lawfully terminate employee-performers who refuse to perform?

At both the summary judgment and the motion for judgment as a matter of law stages, the District Court determined that the Agreements clearly and unambiguously vested Feld with the sole and exclusive right to control the artistic content of its show, including the order of its show. Nonetheless, the District Court submitted to the jury to decide the issue of whether, notwithstanding the Donnerts' breach of express provisions of the Agreements, Feld breached a

16

supposed implied covenant that had the effect of trumping an express provision of the Agreements. This was error.

The Donnerts did not dispute that Feld had the exclusive right to control the order of their show. Nor did the Donnerts dispute that the Agreements required them to have their Comedy Act ready for presentation "in such a manner as [Feld] determines in the show" and "under the supervision, direction, and control of [Feld]." And the Agreements expressly allowed Feld to terminate the Donnerts if they could not or would not perform their act. The Donnerts admittedly refused to perform their Comedy Act in the place Feld assigned them in the production but, instead, demanded that Feld change the order of its show to accommodate them. Based on their refusal to perform as directed, the Donnerts were terminated.

Recognizing that they had breached the Agreements' express terms, the Donnerts claimed that the Lease included an implied covenant that required Feld to "work with them" in good faith to address what-they-considered-to-be safety issues with the order of Feld's show. This theory, however, is faulty in a number of respects and should never have been submitted to the jury.

Initially, such a duty has not been expressly recognized by the Supreme Court of Virginia. And, even if such a duty does exist – and Feld acknowledges that the Fourth Circuit has recognized an implied duty in limited instances – as noted by the District Judge, such a duty does not apply here because such an

17

implied duty would improperly contradict the express language of the Agreements, which required the Donnerts to work under Feld's direction, and would allow a party to rewrite the contract terms.

Nor did the only source of the alleged implied duty – Section 7(c) of the Lease – support the conclusion that Feld had an implied obligation to satisfy every "safety concern" identified by the Donnerts.  This contractual provision was limited in scope and did not impose upon Feld the requirements ascribed to it by the Donnerts.  And, even if such an implied duty did exist, the evidence at trial demonstrated that Feld satisfied any such duty.  Indeed, the Donnerts admitted that Feld presented them with a number of options to help the Comedy Act succeed, all of which the Donnerts rejected.

The District Court also erred when it instructed the jury that a party to a contract who prevents the other from performing has breached the contract because no evidence existed to support such an instruction.  Nor were the Donnerts' alleged damages supported by evidence at trial.  Instead, the only evidence as to the amount of the Donnerts' damages was presented in closing arguments.

Finally, the Donnerts and their counsel made a number of inappropriate comments during the course of the trial relating to evidence that had been specifically stricken by the District Court.  These comments had the effect of

prejudicing and confusing the jury and the District Court abused its discretion by not awarding Feld a new trial.

## ARGUMENT

### I. The District Court Erred in Submitting the Case to the Jury when the Donnerts' Breach of the Agreements Justified their Discharge.

#### A. Standard of Review.

Feld appeals the District Court's denial of its Motion for Judgment as a Matter of Law and its Motion for Summary Judgment pursuant to Rules 50 and 56 of the Federal Rules of Civil Procedure.  This Court reviews the District Court's denial of Rule 50 motions and summary judgment motions de novo.  Hill v. Crum, 727 F.3d 312, 321 (4th Cir. 2013) (citing Sloas v. CSX Transp., Inc., 616 F.3d 380, 392 (4th Cir. 2010)) (district court's denial of Rule 50 motion is reviewed de novo); Florida Auto Auction v. U.S., 74 F.3d 498, 501 (4th Cir. 1996) (grants and denials of summary judgment are reviewed de novo).

#### B. Under the Agreements, Feld Had Cause to Terminate the Donnerts' Employment.

Distilled to its essence, this appeal is about whether an employer-producer had the contractual right to dictate the manner in which it presented its employees-performers in its live production and to terminate the employees-performers if they refused to so perform.  Because the Agreements at issue in this case unambiguously vested Feld with that authority, the District Court erred when it left

the interpretation of these written agreements to the jury by denying Feld's motions for summary judgment and for judgment as a matter of law.

### 1. The Agreements Unambiguously Required the Donnerts to Perform as Directed by Feld.

The general rule in this Circuit is "that when a written contract is clear and unambiguous, it is the duty of the court, not the jury, to determine its meaning." Nehi Bottling Co. v. All-American Bottling Corp., 8 F.3d 157, 161 (4th Cir. 1993) (citing Winn v. Aleda Constr. Co., 315 S.E.2d 193, 194 (Va. 1984)). In this case, neither party, nor the District Court, considered the Agreements to be "ambiguous." Thus, the interpretation of the Agreements' provisions, pursuant to which Feld could terminate the Donnerts, was a matter of law for the District Court to decide and not a question for the jury.

The Employment Contract required the Donnerts to perform "in a first class professional manner under the supervision, direction, and control of [Feld]." (J.A. 620 at § 1 (emphasis added).) Similarly, the Lease required the Donnerts to have their Acts "ready for presentation throughout the Tour in such a manner as [Feld] determines in the show." (J.A. 636 at § 2(a) (emphasis added).) Finally, the Addendum, which modified both the Employment Contract and the Lease, also required the Donnerts to perform "in a first class, professional manner under the supervision, direction, and control of [Feld]," (J.A. 649 at § 2 (emphasis added)),

20

and it expressly permitted Feld to terminate the Donnerts upon any of the following occurrences:

> if [the Donnerts] (i) fail to perform in a first class, professional manner; (ii) disrupt or impede [Feld's] creative and production value and direction of the Production in any way either through action or failure to comply with [Feld's] instructions, or (iii) if [the Donnerts] otherwise conduct [themselves] in a manner unsatisfactory or detrimental to the reputation or standards of [Feld] . . . .

(J.A. 650 § 8.)   The Donnerts never denied that they were aware of these provisions in the Agreements, nor did they dispute that they had "represented that they would be ready to present the Acts in a manner as determined by Feld." (J.A. 190 at Statement of Undisputed Fact ("SUMF") 12; J.A. 438-39.)   Thus, it is undisputed that, under the plain language of the Agreements, Feld had the contractual right to dictate the manner in which it presented the Donnerts' Acts in its show and to terminate the Donnerts if they failed to perform as Feld directed.

## 2. The Donnerts Breached the Agreements by Refusing to Perform as Directed.

It also remained undisputed both at summary judgment and throughout trial that the Donnerts refused to perform their Comedy Act as directed by Feld and as required by the Agreements.  Indeed, even before Feld changed the show order, David took issue with Feld's creative direction of the Comedy Act.  (J.A. 386-89, 393.)  David even went so far as to tell the director on December 18, 2010, before the show order changed, "I will not do this, I will not ruin my act" and that he

would not remain if that was how the show director was going to act. (J.A. 225; 390-91; 656 (Def. Video and Audio Exs. 81-82).)

Thereafter, for practical reasons, Feld changed the order of the show by combining the Comedy Act with the Donnert's Second Pass, which always had occurred—without issue—immediately after the Tiger Act. (J.A. 496-97, 504.) Before even trying to perform the Comedy Act after the Second Pass, David determined that it would not work. (J.A. 395.) Initially, he objected because he thought Feld was treating his Comedy Act like a clown act, and he did not want his act to be used that way. (J.A. 397.)

Over the subsequent few days, David and Cornbread continued rehearsing the Second Pass after the Tiger Act with no issues, and Cornbread began rehearsing the Comedy Act after the Second Pass without difficulty, except that he was reluctant to lie down at the end of the five or six minute act. (J.A. 656 (Pl. Video Ex. 7I); J.A. 657 (Def. Video Ex. 85); J.A. 505, 555.) The Donnerts initially attributed Cornbread's reluctance to lie down to the sound of the tiger cage strike and, later, to the scent of the tigers, and Feld worked with the Donnerts to resolve both issues. (J.A. 195 at SUMF 34; J.A. 446, 457-60, 517, 533-34, 556.)

Despite resolving these issues, the Donnerts and Feld's witnesses all testified at trial that the Donnerts still would not perform the Comedy Act as directed by

Feld, meaning following the Tiger Act.[3]  (J.A. 424, 561.)  The evidence both at summary judgment and at trial further proved that, on January 4, 2011, Feld offered the Donnerts three options in a further attempt to work with their Comedy Act: (i) present the Juggling Act while continuing to practice, but not present, the Comedy Act while receiving pay for both Acts; (ii) remain with the Red Unit, present the Juggling Act, and receive pay for only one act; or (iii) separate from their employment with Feld, in which case Feld would permit them time to seek new employment while presenting the Juggling Act.  (J.A. 197 at SUMF 46, 231-32, 359-60, 422, 467-68, 539-40.)  The Donnerts conceded that they "rejected all three of Feld's options, demanding instead that either the show order be changed or that Feld transfer them back to the Gold Unit."  (J.A. 197 at SUMF 47, 424-25, 464-67, 561.)  Based on this evidence, it is undisputed that the Donnerts did not perform as directed by Feld as required by their Agreements.

---

[3] The Donnerts claimed that Cornbread and, thereafter, Bear Claw became nervous when asked to perform after the Tiger Act.  While the effect of the show order on Cornbread and Bear Claw was disputed at trial, it is undisputed that Feld did not enter into an agreement to lease Cornbread or Bear Claw, specifically.  Instead, the Lease required the Donnerts to provide "a total of four (4) horses" that "will be ready for presentation throughout the Tour in such manner as [Feld] determines in the Show."  (J.A. 636 at § 2(a).)  The Donnerts' failure to provide a suitable horse to perform the Comedy Act as directed was a breach of the Agreements.

23

**C.    The District Court Erred in Denying Summary Judgment when the Undisputed Facts Demonstrated an Actual Breach by the Donnerts that Justified their Discharge.**

In denying Feld's Motion for Summary Judgment, the District Court recognized that Feld had submitted "substantial evidence to support the conclusion that [the Donnerts] were fired for cause based on [the Donnerts'] refusal to work as directed."  (J.A. 248, 251.)  Yet, notwithstanding this evidence, the Court denied Feld's Motion based solely on the ground that, when Feld terminated the Donnerts, its termination letter "state[d] that [they] were fired without cause."  (Id.)

As a threshold matter, the termination letter did not state that the Donnerts were "fired without cause," but only that Feld was releasing the Donnerts from their Employment Contract pursuant to a probationary provision.   (J.A. 655.)  Although during a probationary period Feld could have terminated the Donnerts with or without cause, Feld's mistaken belief that the probationary period was in effect on the termination date did not constitute an affirmative statement by Feld that it did not have cause to terminate the Donnerts' employment.

Moreover, as later recognized by the District Court (J.A. 429), Feld's actual or stated reason for the discharge at the time of termination is not material; instead, the sole issue is whether any reason justifying the Donnerts' discharge existed at the time of termination.  Leahey v. Fed. Ex. Corp., 685 F. Supp. 127, 128 (E.D. Va. 1988) (citing In re Nagel, 278 F. 105, 109 (2d. Cir. 1921) ("The motives which

24

actuate the employer in discharging his employee are wholly immaterial, if a legal ground exists for the discharge")); Heyman v. Kline, 344 F. Supp. 1088, 1101 (D. Conn. 1970) (employer may even justify discharge with facts learned after discharge with respect to employee's misconduct)). "[W]here a sufficient cause exists for the discharge of a servant, although not the inducing motive to the discharge, or even known to the master, it will justify the discharge." Leahey, 685 F. Supp. at 128 (quoting Crescent Horseshoe Co. v. Eynon, 27 S.E. 935, 936 (Va. 1897)). "The law only requires that there be an actual breach of the express or implied contract in order to justify the discharge. . . ." Id.

In ruling on summary judgment, the District Court identified only one fact in dispute: Feld's termination letter. (J.A. 251.) The District Court acknowledged that Feld's other "substantial evidence" supported the conclusion that the Donnerts were fired for cause based on their refusal to work as directed (id.) as required by the express language of the Agreements. (J.A. 649-50 at §§ 2, 8.) By denying summary judgment based solely on Feld's stated reason for discharging the Donnerts when all other undisputed evidence demonstrated that a legal ground did exist for their termination, the District Court erred.

**D.    The District Court Similarly Erred in Denying Feld's Rule 50 Motion when the Evidence at Trial Further Proved that the <u>Donnerts Breached the Agreements, Justifying their Discharge.</u>**

As indicated above, the District Court permitted the case to proceed to trial, erroneously finding that Feld's termination letter created an issue of fact as to whether Feld actually had terminated the Donnerts with or without cause.  (J.A. 251.)   At trial, however, the Donnerts' evidence fared no better.  It remained undisputed that the Donnerts would not (and according to David, could not ever) perform the Comedy Act as directed by Feld and as required by the Agreements. (J.A.  424, 561.)  And all of the evidence presented at trial, including the testimony of Mr. Kiser, who signed the termination letter, demonstrated that the actual reason for the Donnerts' termination was their unwillingness to work with Feld and their failure to perform as directed.   (J.A. 542, 561-62, 567.)   As this undisputed evidence of the Donnerts' breach of the Agreements was sufficient, as a matter of law, to justify a discharge under Virginia law, see <u>Leahey</u>, 685 F. Supp. at 128; <u>Crescent Horseshoe Co.</u>, 27 S.E. at 936, the District Court erred by denying Feld's Rule 50 Motion.

**II.  The District Court Erred by Denying Feld's Rule 50 Motion and by Instructing the Jury that Feld Had an Implied Duty of Good Faith and Fair Dealing in Any Provision of the Agreements.**

**A.  Standard of Review.**

As noted above, the denial of Feld's Rule 50 Motion is reviewed de novo. Hill, 727 F.3d at 321 (citing Sloas, 616 F.3d at 392).  Likewise, this Court also reviews de novo Feld's claim that the District Court improperly instructed the jury that Feld had an implied duty of good faith and fair dealing given Virginia law and the evidence in this case.  Al-Abood v. El-Shamari, 217 F.3d 225, 235 (4th Cir. 2000); Emergency One, Inc. v. Am. FireEagle, Ltd., 228 F.3d 531, 538 (4th Cir. 2000) (Court reviews "de novo whether the district court's instructions to the jury were correct statements of law" and did not "confuse or mislead the jury").

**B.  Any Implied Duty of Good Faith and Fair Dealing is Inapplicable to this Case.**

**1.  By Trial, No Claim for Breach of an Implied Duty of Good Faith and Fair Dealing Remained an Issue in the Case.**

In response to Feld's Rule 50 Motion, the Donnerts asserted that Feld breached a duty of good faith and fair dealing implied in the Agreements, and in paragraph 7(c) of the Lease, in particular.  (J.A.  472, 578-79.)  This theory, however, already had been dismissed by the District Court, and the Donnerts did not—and could not—re-plead it.

Specifically, in response to Feld's motion to dismiss the Donnerts' original Complaint, the Donnerts defended their claim for Breach of Lease on the grounds that an implied duty of good faith and fair dealing required the Court to read certain requirements into the Lease, including a requirement that Feld rearrange its show to "work with" the Donnerts. (Dist. Ct. D.I. No. 11 at 6.) At that time, the Court rejected the Donnerts' position, holding that any duty of good faith and fair dealing arising from the Lease "cannot be used to contradict the express language of the contract which provides that plaintiffs must perform under defendant's direction and that plaintiffs must not 'disrupt[] or impede[] Employer's creative and production value and direction of the Production in any way.'" (J.A. 103, 111.) In fact, the Court went so far as to dismiss the Donnerts' claims related to Feld's failure to rearrange the acts so that the horses did not have to follow the tigers. (J.A. 111.) Thereafter, any supposed claim of implied duty of good faith and fair dealing was abandoned in the Amended Complaint. (J.A. 117-133.)

Even under the "simplified notice pleading standard" of Rule 8(a), a plaintiff must give a defendant "fair notice of what the plaintiffs' claim is and the grounds upon which it rests." Chao v. Rivendell Woods, Inc., 415 F.3d 342, 346 (4th Cir. 2005) (citing Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002)). With respect to any claim for breach of an implied duty of good faith and fair dealing in the Lease, not only was Feld not placed on notice of the revived claim until trial,

but this exact claim already had been dismissed, without leave to amend. (J.A. 111.) Nonetheless, the District Court permitted the Donnerts to revive the dismissed claim at trial by instructing the jury as to Feld's "implied duty of good faith and fair dealing" in the Agreements (J.A. 659, 616), and by denying Feld's Rule 50 Motion, holding that the jury could find "as it did here, that [Feld] did not make a good faith attempt to work with [the Donnerts] to remedy a known safety problem." (J.A. 687-88.) Because this claim was not pleaded in the Amended Complaint and was, in fact, <u>dismissed</u> prior to trial, the District Court erred in instructing the jury as to this claim and in denying Feld's Rule 50 Motion.

### 2. The Supreme Court of Virginia Has Not Recognized this Implied Covenant in Employment Contracts.

Even if the District Court had not dismissed prior to trial the Donnerts' claim that Feld breached an implied duty of good faith and fair dealing in the Lease, the District Court erred by instructing the jury that an implied duty of good faith and fair dealing applied to the Agreements at issue in this case.

As an initial matter, the Supreme Court of Virginia never has expressly held that an implied duty of good faith and fair dealing attaches to all common law contracts. See <u>L&E Corp. v. Days Inn of Am., Inc.</u>, 992 F.2d 55, 59, n. 2 (4th Cir. 1993) (rejecting district court's finding that a contractual agreement arose through an implied covenant of good faith and fair dealing as "the Virginia Supreme Court has yet to recognize such a covenant"); <u>Harrison v. U.S. Bank Nat'l Ass'n</u>, No.

3:12-cv-00224, 2012 U.S. Dist. LEXIS 85735, *5-6 (E.D. Va. June 20, 2012) ("Virginia does not recognize an implied covenant of good faith and fair dealing in contracts outside those governed by the [UCC]"); Healy v. Chesapeake Appalachia, LLC, No. 1:10-cv-00023, 2011 U.S. Dist. LEXIS 759, *41 (W.D. Va. Jan. 5, 2011) ("It does not appear that the Virginia Supreme Court has specifically addressed what, if any, implied duties arise on the part of the parties to a written contract under common law.").

More importantly, several federal courts expressly have held that Virginia law does not recognize such a duty in employment contracts, such as the Agreements. Devnew v. Brown & Brown, Inc., 396 F. Supp. 2d 655, 671 (E.D. Va. 2005) ("Virginia law is decidedly straightforward on this matter: the Commonwealth does not recognize a cause of action for breach of an implied covenant of good faith and fair dealing in employment contracts, and in at-will employment contracts in particular"); Baradell v. Bd. of Social Servs., 970 F. Supp. 489, 494 (W. D. Va. 1997) ("Virginia law does not recognize an implied covenant of good faith and fair dealing in the employment context"); Mickens v. Lockheed Martin Corp. Mission Sys. & Sys., No. 1:11-cv-0117, 2012 U.S. Dist. LEXIS 93209, *9 (E.D. Va. July 5, 2012) (breach of implied covenant of good faith and fair dealing in an employment contract "is not a cognizable cause of action in Virginia").

Because the Supreme Court of Virginia has never extended an implied covenant of good faith and fair dealing from the commercial context[4] to the employment context, the District Court should have erred on the side of restraint. Devnew, 396 F. Supp. 2d at 671 ("when a question of state law presents an issue of first impression, or if a possible interpretation might have the result of creating new law, a federal court must err on the side of restraint") (citing Sellers v. Sch. Bd. of Cty. of Manassas, 960 F. Supp. 1006, 1012 (E.D. Va. 1997) (holding that where "the Supreme Court of Virginia has never recognized a cause of action . . . it would be inappropriate for this Court to do so in the first instance")).  Accordingly, the District Court erred by recognizing this new cause of action in this case when it denied Feld's Rule 50 Motion and instructed the jury as to this claim.

### 3. Even if this Duty Exists, It Cannot Prevent a Party from Exercising Contract Rights or Allow It to Rewrite Contract Terms.

While the Supreme Court of Virginia has not recognized implied covenants of good faith and fair dealing, Feld is aware that some federal courts in this Circuit have determined that this duty may exist in certain cases.  See Wolf v. Fannie Mae, 512 Fed. Appx. 336, 345 (4th Cir. Feb. 28, 2013); Stoney Glen, LLC v. So. Bank & Trust Co., No. 2:13-cv-00008, 2013 U.S. Dist. LEXIS 63763, *10 (E.D. Va.

---

[4] By statute in Virginia, commercial contracts governed by the Uniform Commercial Code contain an implied covenant of good faith and fair dealing.  See Va. Code § 8.1A-304.  No Virginia statute extends this duty to other contracts.

May 2, 2013); <u>Enomoto v. Space Adventures, Ltd.</u>, 624 F. Supp. 2d 443, 450 (E.D. Va. 2009); <u>Skillstorm, Inc. v. Elec. Data Sys., LLC</u>, 666 F. Supp. 2d 610, 620 (E.D. Va. 2009).

Even so, however, both federal and state courts in the Fourth Circuit agree that "when parties to a contract create valid and binding rights, an implied covenant of good faith and fair dealing is <u>inapplicable to those rights</u>" and "cannot be the vehicle for rewriting an unambiguous contract in order to create duties that do not otherwise exist." <u>Ward's Equipment, Inc. v. New Holland N. Am.</u>, 493 S.E.2d 516, 520 (Va. 1997) (emphasis added); <u>Stoney Glen</u>, 2013 U.S. Dist. LEXIS 63763 at *13; <u>LBCMT 2007-C3 Sterling Retail, LLC v. Sheppard</u>, No. 1:12-cv-00470, 2013 U.S. Dist. LEXIS 69913, *15 (E.D. Va. May 15, 2013) (same).

Put differently, "<u>no</u> implied duty arises with respect to activity governed by express contractual terms." <u>Skillstorm, Inc.</u>, 666 F. Supp. 2d at 620 (emphasis added); <u>Vazzana v. Citimortage, Inc.</u>, No. 7:12-cv-00497, 2013 U.S. Dist. LEXIS 78541, *11-12 (W.D. Va. June 4, 2013) (same). Instead, when a party is "acting pursuant to an express contract right, it necessarily [is] acting in good faith under Virginia law." <u>In re Buffalo Coal Co.</u>, No. 06-3362010, Bankr. LEXIS 473, *5-6 (Bankr. N.D. W. Va. Feb. 26, 2010); <u>see</u> <u>e.g.</u>, <u>Charles E. Brauer Co. v. NationsBank of Va. N.A.</u>, 466 S.E.2d 382, 385 (1996) (bank's decision to reduce

claim to judgment could not be a breach of implied duty as it was an exercise of an explicit contract right); Land & Marine Remediation, Inc. v. BASF Corp., No. 06-336, 2012 U.S. Dist. LEXIS 88601, *42-43 (E.D. Va. June 26, 2012) (defendant could not breach implied duty of good faith by exercising a contractual right to terminate lease on ground that plaintiff failed to satisfy contractual duties); Wolf, 12 Fed. Appx. at 345 (bank's exercise of contractual right to foreclose was not a breach of an implied duty of good faith); see also Sun Hotel, Inc. v. SummitBridge Credit Investments III, LLC, No. CL-2012-14062, 2013 Va. Cir. LEXIS 4, * (Va. Cir. Ct. (Fairfax Co.) Jan. 23, 2013) ("defendant cannot breach an implied covenant of good faith and fair dealing by exercising his explicit rights under a contract even though in a manner a plaintiff does not like").

As the District Court held both at the Motion to Dismiss stage and during trial, the Agreements granted Feld the right to supervise, direct, and control the presentation of the Acts in its show (J.A. 620 at § 1, 636 at § 2(a)), including the order of its show (J.A. 111, 585, 601-03), and the Agreements further granted Feld the explicit contractual right to terminate the Donnerts if the Donnerts failed to perform, disrupted, or impeded Feld's creative and production value or its direction of the Production in any way, or failed to comply with Feld's instructions.  (J.A. 650 at § 8.)  Where, as here, Feld exercised its express contract rights to order its show and to terminate the Donnerts because they failed to perform as directed,

33

Feld necessarily was acting in good faith under Virginia law.  <u>In re Buffalo Coal Co.</u>, 2010 Bankr. LEXIS 473 at *5-6.

The District Court even recognized this point at trial, observing, "It's a stretch to say that good faith—implied duty of good faith and fair dealing requires that [Feld change the order of the show] when the contract <u>unambiguously</u> says that it's the circus's power to direct the content and order of the show."  (J.A. 585 (emphasis added).)  And when considering Feld's Rule 50 motion, the District Court further explained,

> That's the problem I'm having with the Rule 50 motion.  I think it clearly and unambiguously leads to the circus as the sole and exclusive control of the artistic content, which includes the order of the show.  That's part of the artistic content of the show.
>
> ***
>
> The reason I'm having difficulty with the Rule 50 is that I don't think the order of the show – they're not required to change the order of the show.  They can – "they," meaning the circus, can have the order of the show in whatever order they want.  But – I'll reserve that until the end after there's a verdict if it's necessary to do so.
>
> ***
>
> The problem is -- with the plaintiff's case, as I see it, is I don't believe there is any implied duty of good faith and fair dealing to change the order of the show.  But I'm going to submit the case to the jury, and we'll see.  That is the only basis, I think, on which the jury might find for plaintiffs, but we'll see. . . .

(J.A. 602-03.)   Because the District Court determined when interpreting the parties' Agreements that Feld had the express contractual right to set the order of

its show and to direct the Donnerts' acts in the show, the District Court's decision to instruct the jury as to an "implied duty of good faith and fair dealing" directly conflicted with Feld's clear and unambiguous contractual rights and amounted to reversible error.

### 4. Plaintiffs Presented No Evidence that Feld Breached Any Implied Covenant of Good Faith and Fair Dealing.

Even if an implied covenant of good faith and fair dealing were applicable to Feld's change in the show order or its termination of the Donnerts because they failed to perform as directed—and it is not—the Donnerts presented no evidence upon which a reasonable jury could have found that Feld breached any such implied duty.  As such, the jury's verdict also was not supported by the evidence.

Where an implied duty of good faith and fair dealing does apply, courts have identified two ways in which that duty may be breached: (1) "where a party has a clear contract right, even if its exercise would arguably be arbitrary, that party is only forbidden from acting dishonestly;" and (2) "where a party has discretion in performance, that party cannot act arbitrarily or unfairly."  Stoney Glen, 2013 U.S. Dist. LEXIS 63763 at *15 (citing cases).

Under Virginia law, merely because a contract may allow a party to choose whether or not to exercise a contractual right, the existence of the choice does not recast such a right as discretionary.  See Land & Marine Remediation, Inc, 2012 U.S. Dist. LEXIS 88601 at *42-43 ("Cases applying Virginia law simply do not

35

support an attempt to recast the invocation of express contractual rights as a discretionary act.") (citing <u>Skillstorm, Inc.</u>, 666 F. Supp. 2d at 620 (rejecting assertion that duty of good faith and fair dealing applied to contractual language stating that defendant "may terminate" purchase orders for any reason) and citing <u>In re Buffalo Coal Co.</u>, 2010 Bankr. LEXIS 473 at *14-15 (where company could terminate an agreement if the other party was "insolvent," the company's decision to terminate when the other party filed for bankruptcy was not discretionary, but the exercise of an express contract right)).

Here, as discussed above, the Agreements gave Feld the express contractual rights to direct and control the Acts in the show and to terminate the Donnerts if they failed to perform as directed.  (J.A. 620 at § 1, 636 at § 2(a), 650 at § 8.) Because these are "clear contract rights," Feld could have breached an implied duty of good faith and fair dealing with respect to these rights <u>only</u> if it had acted "dishonestly."  <u>Stoney Glen</u>, 2013 U.S. Dist. LEXIS 63763 at *15.  During the trial, the Donnerts presented <u>no</u> evidence that Feld acted "dishonestly" in changing the order of its show or in terminating the Donnerts when they would not perform in their assigned slot in the show.  As a result, there is no legally sufficient evidentiary basis upon which a reasonable jury could have found that Feld breached any implied duty of good faith and fair dealing.

Even if Feld had discretion in ordering the acts in its show or in terminating the Donnerts—though both rights were express contract rights, and thus, not "discretionary" in this context—once again <u>no</u> evidence was presented at trial to support any finding that Feld exercised any discretion arbitrarily or unfairly. To the contrary, ample evidence was presented at trial that Feld changed the order of the show for both artistic and practical reasons. For example, Ms. Feld testified that Feld changed Comedy Act's placement in the order of the show because Feld's stage manager (who also is a performer) had insufficient time to assist with the striking of the tiger cage prior to his performance in the aerial act. (J.A. 497.) Ms. Feld explained that, by combining the Comedy Act with the Donnerts' Second Pass (which always had occurred after the Tiger Act), the stage manager was afforded sufficient time between acts. <u>Id.</u> Ms. Feld also testified that the show order was changed to resolve pacing and theme issues with the show, such as the fact that two aerial acts had been set to perform back-to-back and the show felt like it was "dragging" and slow. (J.A. 496-97.) Ms. Feld further testified that the decision to combine the Comedy Act with the Second Pass and to eliminate the Donnerts' Third Pass reduced the length of Act 2, which was running too long for a performance targeted for children. (J.A. 484.) Ms. Feld also testified that the Donnerts were not terminated in order to address the length of the show. (J.A. 513.)

Even if Feld's actions under the Agreements could be construed as discretionary, and they should not be, <u>no</u> evidence was presented at trial upon which a jury could have found that Feld exercised its contract rights arbitrarily. Based on Virginia law and the evidence presented at trial, the District Court erred by denying Feld's Rule 50 Motion and by instructing the jury that Feld had any implied duty of good faith and fair dealing in these Agreements.

### C. Section 7(c) of the Lease Did Not Impose a Duty on Feld to Change its Show Order to Accommodate the Donnerts.

#### 1. The Court Erred in Adopting the Donnerts' Interpretation of Section 7(c).

In arguing that Feld breached an implied duty of good faith and fair dealing in the Agreements, the Donnerts asserted that this duty was implied in paragraph 7(c) of the Lease (J.A. 472, 578-79), which the Donnerts contend imposed upon Feld a duty to work with them on safety issues.[5] (J.A. 578.) In denying Feld's Rule 50 Motion, the District Court agreed with the Donnerts' interpretation of paragraph 7(c) of the Lease and held that there was a legally sufficient basis for the jury to conclude that Feld did not work with the Donnerts to resolve a known

---

[5] In closing arguments to the jury, the Donnerts made a similar argument with respect to section 14(h) of the Employment Contract. That argument fails for the same reasons set forth herein. Specifically, section 14(h) only imposed obligations on the Donnerts, not on Feld. And, section 14(h) makes clear that the referenced "safety and welfare" obligations related only to the international, federal, and state laws and regulations as outlined in section 16 of the Employment Contract.

safety problem.  (J.A. 687-88.)  Because the District Court incorrectly interpreted the duties imposed by paragraph 7(c) of the Lease, the District Court erred in denying Feld's Rule 50 Motion and in submitting the case to the jury.  As the District Court was "in no better position than an appellate court to decide such an issue [of contract interpretation]," this Court reviews the District Court's interpretation of Section 7(c) of the Lease de novo.  Seabulk Offshore, Ltd. v. Am. Home Assur. Co., 377 F.3d 408, 418 (4th Cir. 2004).

In interpreting the Lease, it is well settled that the court must "interpret the [lease] as a whole and seek to harmonize all of its provisions rather than construing isolated portions of the [lease] out of context."  Burgin v. Office of Personnel Mgmt., 120 F.3d 494, 498 (4th Cir. 1997).  "And in harmonizing the [lease's] provisions, it is generally accepted that [the court] give greater weight to specific and exact language than to more general language."  Id. (citing Restatement (Second) of Contracts § 203(c)).  Moreover, the court cannot rewrite the parties' agreements to include different or additional terms.  See Baxter Research Med., Inc. v. Medtronic, Inc., No. 98-1608, 1999 U.S. App. LEXIS 2850, *7 (4th Cir. Feb. 24, 1999) (court cannot rewrite "best efforts" clause to include "unbargained-for contract conditions"); Fransmart, LLC v. Freshii Dev., LLP, 768 F. Supp. 2d 851, 859 (E.D. Va. 2011) (court "cannot rewrite a contract simply because the contract may appear to reach an unfair result").

39

In this case, the District Court interpreted Section 7(c) of the Lease in isolation without reading it with the rest of the Lease and with Section 7(a), in particular. Specifically, section 7 of the Lease imposed a duty upon the Donnerts—not Feld—to comply with certain laws and regulations relating to the transportation, housing, and husbandry of animals. Specifically, 7(a) provided:

> [The Donnerts] acknowledge that there are international and U.S. federal, state, and local laws and regulations governing animals, including, but not limited to, their transportation, housing, care, health status, husbandry and treatment (collectively the "Laws"). [The Donnerts] also acknowledge that [Feld] has its own internal policies and practices regarding training, humane care, and treatment of all animals on the Circus and otherwise, including that all animals be treated appropriately and that physical or verbal mistreatment of any animal is strictly prohibited. [The Donnerts] agree that [the Donnerts] shall, and shall cause the Acts to, at all times throughout the Term, comply with all such Laws, as well as [Feld]'s current policies and any new policies or procedures that may be developed from time to time.

(J.A. 640 at § 7(a).) Section 7(c) then required that the Donnerts—not Feld—make revisions to the handling of their animals to ensure compliance with the above provision. Specifically, section 7(c) states as follows:

> [The Donnerts] also acknowledge that safety is of paramount concern to [Feld] as it relates to animals, the public, and [Feld]'s animal care and other staff, and [the Donnerts] will take all necessary steps to ensure such level of safety. [The Donnerts] also agree to make necessary revisions to the <u>handling of the Animals</u> in a timely manner in order to ensure such compliance, and [Feld] agrees to work with [the Donnerts] to facilitate <u>compliance</u>.

(J.A. 641 at § 7(c) (emphasis added).)

Section 7(c) simply did not impose a duty upon Feld to satisfy any and all issues that the Donnerts characterized as "safety issues."  To the contrary, section 7(c) must be read in harmony with section 7(a), which plainly demonstrates that Feld agreed to undertake only one duty:  to work with the Donnerts to facilitate their compliance with internal policies and with other laws and regulations with respect to transportation, housing, and husbandry of animals.  (J.A. 640-41 at § 7.)  During trial, the Donnerts did not identify even one internal policy, law, or regulation with which they required Feld's assistance to comply.  And <u>no</u> evidence was presented to the jury to suggest that Feld had asked the Donnerts to make revisions to the transportation, housing, or husbandry of their horses in order to comply with any such policies, laws, or regulations.

Despite the limited agreement in Section 7(c) of the Lease, the District Court improperly interpreted Section 7(c) to impose a greater duty upon Feld to address and solve <u>any</u> alleged "safety" issue raised by the Donnerts, a duty to which Feld had not agreed.  If the parties had intended to contractually obligate Feld to work with the Donnerts to resolve any safety issue they raised, then the parties could have so agreed, but the District Court cannot rewrite the Lease for them.  <u>Baxter Research Med., Inc.</u>, 1999 U.S. App. LEXIS 2850 at 7; <u>Fransmart, LLC v. Freshii Dev., LLP</u>, 768 F. Supp. 2d at 859.  As the parties did not agree to require Feld to "work with" the Donnerts with respect to <u>all</u> alleged safety issues, the District

41

Court erred in its interpretation of the Lease and its denial of Feld's Rule 50 Motion.

### 2. The Evidence at Trial Demonstrated that Feld Did "Work With" the Donnerts as to Any Safety Concerns.

Even if Feld had agreed to work with the Donnerts to resolve any alleged safety issues (a broader agreement than the one found in Section 7(c)), the undisputed evidence adduced at trial confirms that Feld did "work with" the Donnerts and attempted to address all of the safety issues they raised with respect to the Comedy Act. Specifically, at trial, the Donnerts raised only two potential "safety issues": the sound made when the tiger cage was dismantled and the scent of the tigers.[6] (J.A. 456.) And the Donnerts testified that these issues were resolved by Feld retraining its staff to dismantle the cage more quietly and by the Donnerts successfully masking the scent of the tigers. (J.A. 457-60.) Robert Donnert even conceded at trial that the issue of the scent from the tigers was omitted from his January 3, 2011, email to Ms. Feld (J.A. 654) because it had been resolved. (J.A. 459.)

Moreover, after the Donnerts sent their January 3, 2011, email seeking help to "fix" the problems, Feld further agreed to work with the Donnerts by giving

---

[6] Of course, Feld disputed at trial – and continues to dispute – that the Donnerts identified the issues that they were having at Winter Quarters as "safety" issues, but Feld views the evidence in the light most favorable to the Donnerts, as it must on appeal.

them time to train their comedy horses as they saw fit—and at full pay—to resolve any issues the horses may have had. (J.A. 467, 539.) The Donnerts' refusal to accept this option does not change the fact that Feld "worked with" the Donnerts in an attempt to resolve the issues they raised. As no contrary evidence exists upon which a reasonable jury could have found that Feld breached Section 7(c) of the Lease, the District Court erred in denying Feld's Rule 50 Motion.

**III.   The District Court Erred in Instructing the Jury that a Party to a Contract who Prevents the Other from Performing has Breached the <u>Contract</u>.**

During trial, the Donnerts also asserted that Feld breached the Agreements by changing the order of the show in a manner that allegedly prevented the Donnerts from performing their obligations under the Agreements. (J.A. 593-94.) Based on this assertion, and over Feld's objection, the District Court instructed the jury that "a party to a contract who prevents the other party from performing his obligations has breached that contract." (J.A. 660, 606-07, 609, 616-18.) As the District Court even acknowledged, however, this legal principal has no application to the facts of this case because the conduct by which Feld allegedly prevented the Donnerts' performance was permitted expressly by the Agreements. (J.A. 609, 617.) Because this jury instruction failed to correctly state the law in this case, this Court's review is de novo. <u>Al-Abood</u>, 217 F.3d at 235.

43

Although Virginia law recognizes as "an implied condition of every contract that one party will not prevent performance by the other party," it is "manifest that this principle has <u>no</u> application when the hindrance is due to some action of the promisor which he was permitted to take under either the express or implied terms of the contract." <u>Whitt v. Godwin</u>, 139 S.E.2d 841, 844 (Va. 1965) (emphasis added); <u>see also</u> <u>Spotsylvania Co. Sch. Bd. v. Seaboard Surety Co.</u>, 415 S.E.2d 120, 124 (Va. 1992) (same); <u>Light v. Beaver Creek Dev. Partners</u>, No. 97-1043, 1997 U.S. App. LEXIS 26910, *14-15 (4th Cir. Sept. 30, 1997) (same). To excuse nonperformance, the action of the party alleged to have prevented performance "must be wrongful and, accordingly, in excess of his legal rights." <u>Whitt</u>, 139 S.E.2d at 844; <u>see also</u> <u>Charlie Norfolk Ctr. Assocs., L.P. v. Norfolk Redev. & Hous. Auth.</u>, No. 2:06-cv-00616, 2007 U.S. Dist. LEXIS 97180, *18-19 (E.D. Va. May 18, 2007).

In this case, the Agreements gave Feld the right to determine the order of its show and prohibited the Donnerts from disrupting or impeding Feld's creative and production value or its direction of the Production in any way. (J.A. 650 at § 8; <u>see also</u> J.A. 650 § 2(a).) None of the evidence presented at trial suggested that Feld acted wrongfully or "in excess of these legal rights" when it changed the order of its show. Further, as the District Court noted, the Donnerts failed to present any evidence that a trained horse could not perform the routine in the order of the show

44

assigned by Feld.  Specifically, when ruling on this instruction, the District Court stated "[t]here was evidence that Cornbread wasn't able to do [the routine] very well, but there isn't any evidence that it couldn't be done.  They weren't asking the horse to jump over the moon or to recite Julius Caesar in Latin or something like that.  There was really no – no – nothing that the circus required that rendered it impossible."  (J.A. 608-09.)

Because the Agreements granted Feld the exclusive right to determine the order of its show and the manner in which it would present the Donnerts' Acts, then, as a matter of law, Feld could not have prevented the Donnerts' performance by exercising its own rights under the Agreements and including this instruction to the jury was error.

Indeed, the District Court, after giving the instruction to the jury, recognized this point and attempted to cure its jury instruction by giving it—a second time— with the additional instruction that "a party does not breach the contract if the party exercises a right it has under the contract."  (J.A. 617-19.)  However, if the legal principal that one cannot prevent another's performance of contract is not applicable, then the jury instruction should never have been given in the first place. And, regardless, it is for the court, not the jury, to interpret the Agreements and to determine whether the Agreements permitted Feld to change the order of its show. See Nehi Bottling Co., 8 F.3d at 161 (where the Agreements are "clear and

45

unambiguous, it is the duty of the court, not the jury, to decide [their] meaning"). By leaving the interpretation of the Agreements to the jury and instructing them that a party breaches a contract by preventing another from performing the contract, the District Court erred.

### IV.    The District Court Erred in Denying Feld's Rule 50 Motion when the Donnerts Failed to Present Evidence of Their Damages.

At the close of the Donnerts' case, Feld made a Rule 50 Motion on the ground that the Donnerts had not presented <u>any</u> evidence of their damages (J.A. 472), an essential element of their claim.  <u>Pilar Servs. v. NCI Info. Sys.</u>, 569 F. Supp. 2d 563, 568 (E.D. Va. 2008) (actual damages are a requisite element of breach of contract claim).  This Court reviews the District Court's denial of that Rule 50 Motion de novo.  <u>Hill v. Crum</u>, 727 F.3d at 321.

Under Virginia law, a jury may not speculate as to the amount of damages. <u>Parkridge Phase Two Assocs. v. Lockheed Martin Corp.</u>, 172 F.3d 44, published in full text format at 1999 U.S. App. LEXIS 1422, *6-7 (4th Cir. Feb. 2, 1999). Instead, "a plaintiff must prove with reasonable certainty the amount of his damages."  <u>Id.</u> (quoting <u>Hale v. Fawcett</u>, 202 S.E.2d 923, 925 (Va. 1974)).  And, when a plaintiff insufficiently proves damages, a defendant's Rule 50 motion should be granted.  <u>Id.</u>

The only evidence presented by the Donnerts that even remotely related to their claim for damages were the Agreements themselves.  However, the fact that

the Agreements were admitted into evidence does not establish the damages that the Donnerts actually incurred.

Specifically, the Agreements obligated Feld to pay wages and rent to the Donnerts only for "Work Weeks" or "public performance weeks." (J.A. 621 at § 4(a)-(b), 639 at § 5(a).) Moreover, for any partial Work Weeks, the Donnerts' pay was prorated. (J.A. 621 at § 3(c), 639 at 5(b).) The Donnerts presented <u>no</u> evidence or testimony regarding the number of Work Weeks or public performance weeks that would have occurred during the remaining term of the Agreements or whether any such weeks would be prorated. Instead, after being placed on notice during Feld's Rule 50 motion of their failure to adduce evidence of their damages, the Donnerts' counsel simply argued during his closing argument that the Agreements entitled the Donnerts to wages and rent for 96 weeks. (J.A. 614.) <u>No</u> evidence in the record supported a verdict of 96 weeks of damages.[7] As the Donnerts' counsel's closing argument was not evidence, nor supported by any evidence, the Donnerts failed to prove their damages with reasonable certainty and the District Court erred in denying Feld's Rule 50 motion.

---

[7] The amount ultimately awarded by the jury to each of the Donnerts equals 96 full weeks of pay less the undisputed amounts that the Donnerts mitigated.

**V.  The District Court Erred in Denying Feld's Motion for a New Trial Based on the Donnerts' Inappropriate Remarks during Trial.**

    **A.  Standard of Review.**

A district court should grant a motion for new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure if (1) the verdict is against the clear weight of the evidence, (2) is based on evidence which is false, or (3) will result in a miscarriage of justice.  Bryant v. Aiken Reg'l Med. Ctrs., Inc., 333 F.3d 536, 543 (4th Cir. 2003).  This Court reviews a trial court's denial of a motion for a new trial for abuse of discretion.  Id.

    **B.  The Donnerts' Remarks During Trial regarding Excluded Evidence Misled the Jury.**

Prior to trial, the District Court granted summary judgment to Feld with respect to the Donnerts' claim that Feld breached an oral contract to care for Karolyi, one of the Donnerts' horses who performed in the Juggling Act and had nothing to do with the Comedy Act.  According to the Donnerts, Karolyi allegedly suffered injuries in May 2010 when he stepped off the rubber matting and slipped on the concrete floor backstage at an arena only weeks after arriving on the Gold Unit.  (J.A. 122 at ¶ 24.)  The Donnerts further had alleged that Feld orally agreed to provide lifetime care for Karolyi as a result of these injuries.  (J.A. 130-31 at ¶¶ 70-71, 73.)  After their own deposition testimony proved to the contrary, the District Court granted summary judgment to Feld as to this claim.  (J.A. 251-52.)

Despite the District Court's grant of summary judgment on this issue, the Donnerts, and David Donnert in particular, made repeated references during their testimony to their "injured horse," referring to Karolyi. (J.A. 329, 379, 433-34, 441, 454.) These prejudicial remarks misled the jury into believing that their allegedly "injured horse" was related to the Donnerts' Comedy Act and their claims of "safety issues," on which they sought to justify their refusal to perform the Comedy Act, when, instead, any alleged injury to Karolyi occurred backstage on a different circus unit more than six months earlier and had nothing at all to do with the Comedy Act.

Similarly, during a motion in limine at the start of trial, the District Court excluded a SurgiCare Discharge Report (J.A. 652) and its contents on the ground that it contained inadmissible hearsay.[8] (J.A. 310-316.) Despite this ruling, the Donnerts and their counsel referenced this inadmissible report throughout trial, including opening statements and closing argument, misleading the jury into believing a serious injury had occurred as a result of a "safety issue." (J.A. 319-20, 448-49, 520, 549-50, 612.) Because the Donnerts' repeated remarks regarding excluded evidence misled the jury, resulting in a verdict not supported by the

---

[8] Feld objected to the exhibit on grounds of hearsay (Fed. R. Evid. 802), relevance (Fed. R. Evid. 401 through 403), authenticity (Fed. R. Evid. 901), and on the ground that the Donnerts had not identified the veterinarian author of the report as an expert witness, and the report contained expert opinions not disclosed pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure.

evidence and a miscarriage of justice, the District Court erred in denying Feld's Motion for a New Trial.

## CONCLUSION

For the foregoing reasons, it is respectfully requested that the judgment of the District Court for the Eastern District of Virginia, Alexandria Division, be vacated and that final judgment be entered in favor of Petitioner Feld Entertainment, Inc. or that, alternatively, the case be remanded to the District Court for a new trial.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Feld Entertainment, Inc., d/b/a Ringling Bros. and Barnum & Bailey Circus, respectfully requests that an oral argument be scheduled in this matter.

Respectfully Submitted,

*/s/ Laurie Proctor*

William Boyle Porter
Laurie Proctor
Blankingship & Keith, PC
4020 University Drive
Suite 300
Fairfax, Virginia 22030
(703) 293-7236

*Counsel for Appellant*
*Feld Entertainment, Inc.*

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 14-1098          **Caption:** Robert Donnert, et al. v. Feld Entertainment, Inc.

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[✓] this brief contains ____12,616____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[ ] this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[✓] this brief has been prepared in a proportionally spaced typeface using
Microsoft Word 2010 _____ [*identify word processing program*] in
Times New Roman 14 Point _____ [*identify font size and type style*]; **or**

[ ] this brief has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s) Laurie Proctor _____

Attorney for Feld Entertainment, Inc. _____

Dated: 6/23/2014 _____

# CERTIFICATE OF SERVICE

I certify that on  June 23, 2014     the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Robert Wayne Pierce
PIERCE LAW FIRM, LLC
133 Defense Highway
Suite 201
Annapolis, MD 21401
410-573-9955
wpierce@adventurelaw.com

/s/ Laurie Proctor
_____
Signature

6/23/2014
_____
Date